# DeBardeleben *v.* Bessemer Land & Improvement Company.

### *Bill in Equity for an Injunction.*

1. *Corporations; fiduciary relation existing between president and corporation; resulting trust.*—When the president of a corporation prospects for and develops lands, on behalf of such corporation, and with its laborers and money, all of which were furnished and paid under his direction as president, by approval of individual members of the directory, upon his representation that he was arranging to lease the lands for the benefit of the corporation and never suggesting that he wanted an interest in them for himself, any benefit from such investigation and lease belongs to the corporation. As an officer and agent

of the corporation, his trust disqualified him from acquiring any interest in the lands to the detriment of that which had been acquired by the corporation.

2. *Same; same; agreement.*—In application of this principle, a trust may be established, in the absence of any agreement therefor, in writing or parol.

APPEAL from the Chancery Court of Jefferson.

Heard before the Hon. JOHN C. CARMICHAEL.

This is an appeal from a decree overruling motion to dissolve an imjunction for want of equity in the cross-bill filed by appellee. The original bill was filed by H. F. DeBardeleben against the Bessemer Land & Improvement Company. It alleged that after the expenditure of much time and money in prospecting, complainant located a valuable coal property and leased the same for twenty years; there being two leases covering the property, both being taken in the name of DeBardeleben and the Bessemer Land & Improvement Company; that these leases each contained stipulations binding the lessees to pay a certain amount as minimum royalty; that shortly after the execution of the leases, DeBardeleben and the Bessemer Land & Improvement Company took possession of the lands therein and opened coal mines thereon, the expenses incident thereto being borne by the Bessemer Company; that at about the time said mine was opened up so as to yield an output for market, De-Bardeleben who had been president of the company, severed his connection with the company; that at this time he was financially embarrassed and was unable to pay any of the expenses of running said mine and paid no further attention thereto; that the Bessemer Company has continued in the active operation of the mines up to the filing of the bill and has mined and sold large quantities of coal, no part of the proceeds of which have been paid to complainant; that complainant has demanded an accounting and his share of the proceeds of the sales of coal from said lands to be paid to him after deducting proper expenses incident to the mining and selling of said coal; that the Bessemer Company has refused to account for the sales of coal; that the Bessemer Company has expended large sums of money in mining and

[DeBardeleben v. Bessemer Land & Improvement Company.]

selling the coal and that complainant's share of such expenditure should be charged to him and his share of the proceeds of the sales of coal, after deducting such expenses, should be paid to him. One of the leases was made on the 11th of March, 1895, with the Alabama Mineral Land Company, and the other lease was made on the 15th of May, 1895, with C. G. Smith and others. Copies of both leases are attached to complainant's bill.

The Bessemer Land & Improvement Company demurred to complainant's bill, and also filed an answer and cross-bill, the substance of which is as follows: The Bessemer Company admitted that complainant executed the two leases, both being taken in his own name and in the name of the Bessemer Company as lessees. The cross-bill denied that DeBardeleben had spent any of his own money in prospecting for coal on the leased lands, and alleged that said leases had been acquired in the following manner: That on and prior to the 18th of June, 1894, DeBardeleben was the president of the Bessemer Company, but that up to that date his duties as president had been practically nominal; that on the 18th of June, 1894, at a meeting of the board of directors of the Bessemer Company, DeBardeleben, who was a large stockholder and president of the Company, agreed with the company to accept a salary of five thousand dollars, the consideration of which was, that he should devote his time and energies to the management of the company's business; that after making this arrangement, DeBardeleben conceived the idea of acquiring for the company large coal mining properties; that pursuant to this purpose, in the winter of 1894-5, DeBardeleben spent practically all of his time in the coal fields of Alabama investigating, on behalf of the said Bessemer Company, for coal lands that he thought might be profitably acquired and worked; that in the course of these investigations he found coal, apparently satisfactory, on the lands embraced in the two leases set out in the original bill; that when he found there was coal on these bodies of land, he spent a large amount of the company's money in prospecting and exploiting this coal; that in the exploitation on these lands he employed several assistants and a large num-

ber of laborers, and the salaries and wages of this force and all of the expenses of the investigation were under DeBardeleben's direction as president, and were charged to and paid by the Bessemer Company; that DeBardeleben made trips to New York and other points to secure the leases of said lands, and collected from the company money to defray the expenses of all these trips. The cross-bill further alleges that after DeBardeleben had devoted all of his time and energies as president, and spent thousands of dollars of its money in the exploitation and acquisition of the lands embraced in the two leases, it became his duty to take said leases solely for the benefit of the Bessemer Company. The cross-bill then avers at this time DeBardeleben was in the absolute and entire control of the business of the Bessemer Company, subject only to the supervision of its board of directors; that nearly all or quite a majority of its directors were residents of South Carolina, and that meetings of the directors were usually held not more than once or twice a year; that DeBardeleben was supposed to report to these meetings, but that except for such instructions as might be given him by the directors' meetings, he absolutely dominated the affairs of the company; that no meetings of the directors were held from the 21st of November, 1894, to the 21st of May, 1895, but that prior to the execution of the two leases in question and during the time when DeBardeleben was spending the company's money in exploiting the coal on the leased lands, he discussed with various directors of the company the work he was doing in exploiting these lands preparatory to acquiring them by lease, and expatiated to these directors on the profits which the company would realize from the mining operations on these lands, obtaining the acquiescence and approval of these individual directors in the outlay he was making for the company and the efforts he was making to acquire these lands on behalf of the company; that at none of these conferences did DeBardeleben ever suggest any intention of acquiring any individual interest in these lands; that the insertion by DeBardeleben of his name in said leases was without the consent or knowledge of

defendant, and was a fraud on his part and a breach of his fiduciary obligations; that the leased lands were distant from the railroad, necessitating the construction of a costly railroad to make the coal available. Both leases were to run for twenty years, and together they imposed a minimum annual royalty of eleven thousand, seven hundred and twenty dollars; that the opening and equipment of mines on the leased lands together with the construction of the railroad involved an outlay of hundreds of thousands of dollars, and that while DeBardeleben owned a large amount of the stock in the Bessemer Company, this stock was pledged and DeBardeleben had no means of his own to contribute to the outlay required in the development of the mines; that after the execution of these leases DeBardeleben took charge of the leased lands and commnced spending the Bessemer Company's money in erecting houses and opening mines thereon, obtaining from the secretary and treasurer, who was subject to his orders, all the money required; that on the 21st of May, 1895, a meeting of the directors of the Bessemer Company was held at which DeBardeleben was present, acting as chairman; that at this meeting DeBardeleben explained to the board the work he had done in looking for coal lands, and the success he had met with, describing the location of the lands and their value, and stated that the company could mine coal from these lands so cheaply that it could sell the output at less than cost of production to other mines. The cross-bill further avers that complainant submitted to the board the two leases which he had executed and expressly disclaimed and disavowed any personal interest in said leases or any intention of acquiring any personal interest in the said leases by becoming a party thereto; that he explained the insertion of his name in said lease in the following manner: That the lessors in the negotiations leading up to said leases had stated that they did not know the Bessemer Company, but did know and have confidence in DeBardeleben, and desired him to put his name in the leases an as accommodation to them, and that he allowed his name to be inserted in said leases, being willing to be a nominal party thereto, but not in-

tending thereby to acquire any interest whatsoever in said leases. The cross-bill then avers that at this time the Bessemer Company had no debts and owned property worth from half a million to a million dollars, and that DeBardeleben was the largest shareholder in the company, owning about one-fourth of its entire capital stock; that while the directors would have repudiated DeBardeleben's acquiring a half interest in the lands under the circumstances, after the expenditure made thereon by the company, they were misled into a feeling of security by the statement of complainant that he claimed no interest in said leases, but had simply allowed his name to be inserted in compliance with the request of the lessors, having entire confidence in the ability of the Bessemer Company to carry out the obligations imposed by the leases; that DeBardeleben's disclaimer of interest was fraudulently made by him for the purpose of misleading the directors; that after DeBardeleben's explanation of the value of the leases to the company and his disclaimer of any personal interest therein, he stated to the board that he hoped it would accept his leases for the company, but that if the company did not care to own the leases, he would take them individually; that in this discussion DeBardeleben recognized the right of the company to the sole ownership of the leases, if the directors desired to approve the acquisition thereof, and did not intimate or suggest that he and the company should own the leases jointly or pretend that he had any interest in the leases whatsoever, and that thereupon it was resolved that the company should take over the leases and the leases were adopted by the Bessemer Company as its leases; that while it appears from the minutes of the meeting that the leases were approved by the directors on motion, the intent and meaning of the resolution and the understanding of the directors and of DeBardeleben was, not that the leases should be approved, DeBardeleben having half interest therein, but that the leases should be taken for the sole benefit of the company, DeBardeleben disclaiming any individual interest. A copy of the minutes of this meeting is attached to the cross-bill from

which it appears that before the leases were adopted a statement was made by DeBardeleben of the amount of money that would be required to open the mines, and discussion was had as to the financial ability of the company to open the proposed mines and to construct a steel plant, under contemplation.   Later on in the meeting and just before its adjournment, DeBardeleben asked if they would allow him to furnish one-fourth of the capital for the opening and operation of the Belle-Ellen mines (which name he had given to the property named in the two leases), and give him a fourth interest in the two leases, stating that he desired this personal interest and that it would be an incentive.   On motion the board agreed to allow DeBardeleben to furnish one-fourth of the capital necessary for the opening and operation of the said mines, whereupon he should receive one-fourth interest in said leases.   The cross-bill further avers that by DeBardeleben's disclaimer of interest in said leases and his request that he should be allowed to acquire a one-fourth interest in said leases by furnishing one-fourth of the capital necessary for the opening and operation of said mines, the board of directors of the Bessemer Company were induced to abstain from action which they otherwise would have taken to repudiate the fraudulent conduct of DeBardeleben in making himself a party to said leases in their original execution; that while the directors would not have consented to entering into an equal patnership with DeBardeleben in the ownership and operation of leases acquired at the expense of the Bessemer Company when DeBardeleben had neither furnished any of the money in the original acquisition of said leases nor made any arrangement to furnish any of the money required in the operation and development of said lands, that the directors were willing to accept complainant's proposition that he should furnish one-fourth of the money required for the development of the mines, thereby acquiring a one-fourth interest in same; that while no time was fixed within which DeBardeleben should pay his one-fourth of the money, that it was contemplated that it would be within a reasonable time and in advance of the expenditure for the

opening and operating of the mines. The cross-bill further avers that after the meeting of May 21st, 1895, the Bessemer Company having been induced by DeBardeleben to believe that it owned solely and exclusively the two leases, allowed DeBardeleben as its president to push the opening and development of coal mines on the leased lands, building railroads, houses for employes, sinking slopes and equipping the mines with all necessary machinery and buildings for the mining of coal; that none of these expenditures would ever have been made except for DeBardeleben's disavowal of any interest in the leases, but that deluded by said disavowal, the directors gave DeBardeleben virtually unlimited authority to expend the company's funds in the development of the leased lands, and that under DeBardeleben's direction mines were opened and equipment provided requiring an expenditure of over three hundred thousand dollars; that after making these large expenditures the mines as originally opened proved to be unsuccessful, and the Bessemer Company thereupon commenced the opening of a new mine, and that months went by before this new mine could be made profitable, during which such large expenditures were made as that the credit of the company became strained, and bankruptcy appeared inevitable; that DeBardeleben lost heart in the enterprise and resigned from the presidency of the Bessemer Company; that thereafter the company raised further funds with the endorsements of its directors, finally securing a large output from the mines, which began to be profitable and repay a portion of the funds expended in their development. The cross-bill further avers that DeBardeleben's proposition to furnish one-fourth of the money necessary for the development of the mines and to acquire a one-fourth interest was not consummated; that DeBardeleben never furnished or offered to furnish any money for the development of the mines, and the proposition was treated by DeBardeleben and the company alike, as being abandoned, DeBardeleben taking no further interest in the development of the mines, resigning the presidency of the company and engaging in other business. The cross-bill then averred that an action of

[DeBardeleben v. Bessemer Land & Improvement Company.]

ejectment had been brought by DeBardeleben against the Bessemer Company in the circuit court of Bibb county, seeking to recover an undivided half interest in the leased lands. In the prayer of the cross-bill the respondent asked for an interlocutory injunction restraining the prosecution of this action of ejectment, and that a decree be rendered divesting all legal title out of the said DeBardeleben to said leases and restraining him from claiming any further interest therein.

On the filing of the cross-bill the complainant in the original bill demurred thereto, assigning many grounds. On the submission of the cause upon this demurrer to the cross-bill, the Chancellor rendered a decree overruling the demurrer to the cross-bill. Thereafter, in accordance with the application in the cross-bill and upon the complainants therein giving the bond as required, an interlocutory injunction was issued, restraining the prosecution of the ejectment suit instituted by DeBardeleben. After the issuance of this injunction DeBardeleben, as respondent to the cross-bill, moved the court to dissolve the injunction for want of equity in the cross-bill. On the submission of the cause upon this motion to dissolve the injunction, the court rendered a decree overruling said motion. From this decree the present appeal is prosecuted. The appellant assigns as error the rendition of the decree overruling the demurrer, and the rendition of the decree overruling the motion to dissolve the injunction.

SMITH & SMITH, for appellant.—Where one co-tenant receives rents and profits from the common property, he is liable to other tenants for their share.—*Sanders v. Robertson,* 57 Ala. 465; *Autrey v. Fricze,* 59 Ala. 587; *McCaw v. Barker, et al.,* 115 Ala. 543; 22 So. 131; *Gayle v. Johnston,* 80 Ala. 395; *Tarleton v. Goldthwaite Heirs,* 23 Ala. 346; 58 Am. Dec. 296.

The complainant's relation was certainly not one of greater trust than that of a business partner; it is only when one partner secretly or fraudulently acquires property in his own name which he should have acquired in the firm name, that equity will hold him to be a trustee. *Mitchell v. Reed,* 61 N. Y. 123.

[DeBardeleben v. Bessemer Land & Improvement Company.]

The defendant had no interest or expectancy in the land at the time complainant leased in his own name one-half interest in the property, on his credit, and although an officer of the company at the time, there is no implied trust.—*LeGarde v. Anniston Lime Co.*, 126 Ala. 496; *Rogers v. Simmons et al.*, 55 Ala. 76; *Whiting v. Dyer*, 43 Atl. (R. I.), 181.

In order to establish a resulting trust it would be necessary to aver and prove that complainant in the cross-bill actually made the payment of the consideration for the leases, "or that an absolute obligation to pay should be incurred by him (it) as a part of the original transaction of purchase (lease), at or before the time of the conveyance, no subsequent and entirely independent conduct, intervening or payment on his (its) part would raise any resulting trust."—2 Pomeroy's Equity, Sec. 1037; 1 Perry on Trusts, Sec. 126 and Sec. 134; *Haney v. Legg*, 30 So. (Ala.), 34; 129 Ala. 619; *Tilford v. Torry*, 53 Ala. 120; *Holliday v. Shoop*, 59 Am. Dec. 88; 15 Am. and Eng. Ency. Law (2d ed.), 1139, 1143, *et seq; Carleton v. Rivers*, 54 Ala. 467; *White v. Farley*, 81 Ala. 567; *Cowles and wife v. Allen et al.*, 64 Ala. 98; *Myers v. Myers*, 35 S. E. 868.

And "if only a part of the purchase money is paid by a third person, a trust results *pro tanto.*"—1 Perry on Trusts, § 126; *Haney v. Legg*, 129 Ala. 619; 30 So. 34; *Tilford v. Torry*, 53 Ala. 120.

The cross-bill seeks to establish and enforce a trust in lands resting in parol, not raised or resulting by implication or construction of law, and is therefore subject to the demurrer interposed.—Code, § 1041; *Patton v. Beecher*, 62 Ala. 579; *Brock v. Brock*, 90 Ala. 86; 8 So. 11; *Houston v. Farris*, 93 Ala. 586; *Perry v. Jackson*, 85 Ala. 67; *Rose v. Gibson*, 71 Ala. 35; *Long v. King*, 117 Ala. 423; 23 So. 534.

PERCY & GRUBB, *contra.*—When DeBardeleben entered upon the lands avowedly in the company's interest and expended the company's money in investigating same, procuring the acquiescence of the directors by the representation that he was acting for the sole benefit of

the company, he charged himself with a fiduciary obligation with reference to these lands. When DeBardeleben went to the lessors to procure the execution of the leases, fidelity to his trust required that he act for the company. His executing the leases to vest a half interest in himself was a constructive fraud. While no time was fixed within which the money was to have been paid by DeBardeleben, manifestly it was to have been furnished within a reasonable time, and should have been furnished in advance of and as required for expenditures made in the development of the mines. As sustaining the propositions just stated, see the following authorities: *LaGarde v. Anniston Lime & Stone Co.,* 126 Ala. 500; *Kent v. Dean,* 128 Ala. 609; *Sanford v. Hamner,* 115 Ala. 413; *Waller v. Jones,* 107 Al.a 341; *Brock v. Brock,* 90 Ala. 89; *White v. Farley,* 81 Ala. 563; *Manning v. Pippen,* 95 Ala. 543; *Stayton v. Graham,* 139 Pa. State Reports, 12; *Faxon v. Faxon,* 28 Mich. 159; *Goetter, Weil & Co. v. Norman Bros.,* 107 Ala. 595.

SHARPE, J.—Inasmuch as the motion to dissolve the injunction is based solely on an assumed want of equity in the cross-bill, the averments of the cross-bill are to be taken as true. From those averments it appears among other things that for some time before taking the leases in question DeBardeleben was the president of the defendant corporation and had in its behalf and with its laborers, been prospecting for and developing coal lands including those afterwards described in the leases; that in developing this coal and in making trips to New York and other places to secure leases on these particular lands for the sole benefit of the corporation, much money was expended, all of which was paid by the corporation under the direction of its president, DeBardeleben; that when doing this work and making this expenditure he obtained the approval of individual members of the corporation's directory, and stated to them he was arranging to acquire the lands by lease for the benefit of the defendant corporation and never suggested to them that he wanted to acquire any interest in the lands for himself. In this connection the

cross bill avers "that complainant fraudulently inserted his name in these leases without the consent or knowledge of this defendant."

Under the facts and circumstances so disclosed, in the cross bill, whatever benefit was obtained from the work done and money expended in ascertaining the character and resources of the land and the negotiations had for its acquisition, accrued to and belonged to the corporation. Though that benefit did not prior to the agreement for leasing, amount to an enforceable interest in the lands, it did exist in the form of an expectancy, practical of realization, and attended with an advantage valuable in some degree proportionate to the cost of obtaining the same. This valuable expectancy was so far a property right as to pass under and become subject to the trust attaching to DeBardeleben as an officer and agent of the corporation, and that trust disqualified him to acquire any interest in the lands to the detriment of that which had been acquired by the corporation in the manner stated. A decision, which, though based on somewhat different facts, tends to support this conclusion, was made by this court in *Lagarde v. Anniston, etc. Co.,* 126 Ala. 496. See, also, Cook on Corporations, § 660; 3 Thompson on Corporations, § 4073; *Robinson v. Jewett,* 116 N. Y. 40.

A principle which of itself would authorize relief on the case made by the cross bill, is stated in *Lagarde v. Anniston, etc. Co.,* as follows: "Directors and other governing members of a corporation are so far agents of the corporation that in their dealings respecting corporate interests, they are subject to the rules which apply generally to persons standing in fiduciary relations and which forbid such persons to secure an advantage for themselves which fidelity to the trust reposed in them would carry to others whose interests they ought to represent. It is a breach of their fiduciary obligations which equity will not tolerate for such officers in antagonism to the corporate interest to oust the corporation from beneficial property rights which ought to be preserved to it by acquiring the property for themselves. Derelictions of this kind are treated as a fraud on the

[Bradford *et al.* v. Wilson *et al.*]

corporation out of which equity will raise a constructive trust in its favor."

In application of this principle a trust may be established in the absence of any agreement therefor, in writing or parol.

What we have said will suffice to show the decree overruling the motion to dissolve was not erroneous and it is not, for the purpose of this appeal, necessary to consider that phase of the bill which seeks relief upon the theory of estoppel.

The decree overruling the demurrer to the cross-bill not having been appealed from is not before us for review, and, therefore, the assignment of error purporting to be based thereon is not considered.

Affirmed.